## SOUTHERN PACIFIC CO. v. UNITED STATES.

United States District Court
S. D. New York.
March 13, 1953.

Minor, Waterman & McLean, New York City (Robert J. McLean, New York City, of counsel), for plaintiff.

Myles J. Lane, U. S. Atty. for the Southern District of New York, New York City (Lawrence G. Greene, Asst. U. S. Atty., New York City, of counsel), for United States.

IRVING R. KAUFMAN, District Judge.

The facts, as stipulated, are as follows:

(1) Pursuant to a Plan of Reincorporation, the assets of Southern Pacific Company, a Kentucky corporation, were transferred on September 30, 1947, to Southern Pacific Company, a Delaware corporation, in consideration of the assumption by Southern Pacific Company (Delaware) of all the liabilities and obligations of Southern Pacific Company (Kentucky), and the issuance to Southern Pacific Company (Kentucky) of 3,772,763.0564 shares of the common stock of Southern Pacific Company (Delaware).

(2) That at 10:30 A.M., Eastern Standard Time, on September 30, 1947, at Wilmington, Delaware, plaintiff, Southern Pacific Company (Delaware), issued and delivered to Southern Pacific Company (Kentucky), its Certificate No. CN1 for 3,772,-763.0564 shares of no par value common stock and United States documentary stamps in the amount of $242,634.83 were at the same time affixed to the stock transfer sheet of Southern Pacific Company (Delaware) covering the original issue of Certificate No. CN1 and cancelled.

(3) That at 2:30 P.M., E.S.T., on September 30, 1947, Certificate No. CN1 was endorsed by Southern Pacific Company (Kentucky) in favor of its stockholders and upon surrender to and cancellation by Southern Pacific Company (Delaware) of Certificate No. CN1, Certificate No. CN2 for 3,772,763.0564 shares of no par value stock was issued and delivered at 2:35 P. M., E.S.T., on September 30, 1947, to the stockholders of Southern Pacific Company (Kentucky) by Southern Pacific Company (Delaware).

(4) On September 29, 1947, plaintiff, Southern Pacific Company, had purchased

from defendant, United States of America, in New York City, United States documentary stamps in the amount of $244,-758.03 based upon the closing market price of $43.25 on September 29, 1947, of Southern Pacific Company stock on the New York Stock Exchange, and that after having affixed, on September 30, 1947, at 10:30 A.M., United States documentary stamps in the amount of $242,634.83 (based upon the opening market price of $42.875 per share at 10:20 A.M., on September 30, 1947, on said Exchange), to the stock transfer sheet of Southern Pacific Company covering issuance of Certificate No. CN1 and having cancelled the aforesaid stamps, plaintiff had in its possession unused documentary stamps in the amount of $2,122.20.

(5) On October 10, 1947, plaintiff duly filed with defendant, a claim for refund of the unused documentary stamps in the amount of $2,122.20.

(6) On April 28, 1948, the Commissioner of Internal Revenue rejected the aforesaid claim for refund in the amount of $2,122.20 and ruled that United States documentary stamps in the amount of $246,512.-34, based upon the average selling market price of $43.56 per share on September 30, 1947 (average of highest and lowest selling market prices on that date), should have been affixed to the aforesaid stock transfer sheet and cancelled, and assessed a deficiency of stamp taxes in the amount of $3,876.51 against plaintiff.

(7) Pursuant to the aforesaid ruling and assessment of the Commissioner of Internal Revenue, plaintiff, on September 22, 1948, affixed and cancelled, under protest, documentary stamps in the amount of $3,-876.51 to the aforesaid stock transfer sheet of Southern Pacific Company covering the original issue of Certificate No. CN1.

(8) On September 22, 1948, plaintiff duly filed with defendant, a supplemental claim for refund of unused stamps in the amount of $1,754.31 on account of the purchase of additional stamps to comply with the aforesaid ruling and assessment of defendant.

(9) On March 18, 1949, the Commissioner of Internal Revenue rejected said supplemental claim for refund in the amount of $1,754.31.

(10) On September 29, 1947, 1,100 shares of Southern Pacific Company common stock were sold on the New York Stock Exchange, the opening market price of said shares being $42.375 per share and the closing market price being $43.25 per share.

(11) On September 30, 1947, 2,600 shares of Southern Pacific Company stock were sold on the New York Stock Exchange, the opening market price (at 10:20 A.M.) of said shares being $42.875 per share, the lowest market price being $42.875 per share, the highest market price being $44.-25 per share, and the market price at 10:30 A.M., when Certificate No. CN1 was issued, being $43.125.

(12) Regulation 71 (1941), Sec. 113.23, provides:

"(a) General.—The rates of tax are as follows:

No Par Value Stock

11 cents on each $100 or fraction thereof of the actual value of each certificate, where the actual value of each share is $100 or more.

3 cents on each $20 or fraction thereof of the actual value of each certificate, where the actual value of each share is less than $100.

"(c) No par value stock.—Where stock has no par value, the rate of tax is determined by the actual value of each share and the amount of tax, computed at such rate, is measured by the actual value of the certificate * * *.

"The actual value of stock not having a par value shall be determined on the basis of the market value of the stock *at the time of issuance*. If there is no ascertainable market value of the stock at the time of issuance, the actual value must be determined on the basis of all the facts and circumstances of the particular case." (Emphasis supplied).

In the letter referred to in paragraph (6) above, the Commissioner in rejecting the refund claim took the position that

"where new stock without par value

is listed upon a stock exchange the tax upon the issuance of said stock should be based upon the price at which the stock is traded in on the exchange on the day of issue. In other words, under such circumstances, time of issuance is considered to mean the date of issuance, since only in this way can the market value of the stock be accurately ascertained. Such a construction avoids the possibility of an artificially fixed opening price and furthermore achieves a result which clearly reflects the play of market conditions upon the stock in question.

"In the case of stocks listed upon an exchange, the mean between the highest and lowest quoted selling prices is considered as its market value. The stock of the new company opened on September 30, 1947, at a price of $42.-875 and closed at a price of $44.25. Its market value on that day therefore was $43.56. Computed at the rate of three cents for each $20.00 or fraction thereof of the actual value of the certificate, namely, $164,341,558.74, the documentary stamp tax incurred upon the issuance of said stock, under the provisions of section 1802(b), supra, amounted to $246,512.34."

Despite the existence of Treasury Regulation 113.23 since 1926 (Reg. 71, Art. 27 (d)) it appears that this is the first occasion upon which the Commissioner's practice of adopting the mean value on the "date of issuance" of no-par stock traded on a national exchange as the market value, has been challenged on the grounds that "time of issuance" as used in that Regulation refers to the precise moment when the issuance takes place.

The factors which have led the Commissioner to this interpretation are readily inferable and have been partially set forth in his letter rejecting taxpayer's claim. Use of the mean figure for a day as the market value of no-par securities sold on a national exchange instead of value at the exact time of issuance avoids what may often be the difficult factual problem of determining the precise moment of issuance and the value at that time. The difficulties in ascertaining these factors are increased by virtue of Treasury Regulation 71, Section 113.22 which provides:

"Issuance of stock—Stock is deemed to be issued when it is subscribed for and the subscription is accepted."

See M.T. 37, 1949–1 Cum.Bul. 241. It is doubtful whether in the ordinary corporate transaction a record of the exact time of the acceptance and of the market value at that time would be kept. It is noted that in this case acceptance and delivery were simultaneous. Moreover, here the original issue was part of a plan of reincorporation and it was necessary that each of several steps taken to achieve this result, occurring in several different States, be taken in specific and absolute sequence for them to have legal efficacy. Furthermore, here the entire issue went to one corporation. Where, however, the original issue is of but a few securities to each of many holders, the likelihood that a record be kept of the exact time at which each share is issued and of the market value at that time is slight. Especially where there has been no physical transfer but the stock is deemed to be issued solely by virtue of an acceptance, under the above quoted Regulation, is difficulty in ascertaining time and market value as required by the plaintiff's interpretation likely to be encountered. Where an exact record of the time is not available or where the issuance occurs either before the national exchange has opened or after it has closed, and the market value at the exact instance of issuance is therefore unascertainable, both the Commissioner and the taxpayer would have to resort to other criteria.

A further advantage to the use of the mean value on the date of issuance is that it provides a figure less susceptible to manipulation than that of a market quotation as of a particular moment, as, for example, an opening price. A truer picture of the market value of the issue is obtained under the Commissioner's interpretation.

Because of these practical considerations in favor of the Commissioner's method, the long standing practice in accordance there-

640

with, and giving his interpretation the great weight to which it is entitled, this Court would be reluctant to override his interpretation unless the language of the statute or the Regulation compelled such a result. I think that it does not. See Helvering v. Winmill, 1938, 305 U.S. 79, 83, 59 S.Ct. 45, 83 L.Ed. 52.

It is true that the phrase "time of issuance" is an unsatisfactory way of describing the practice of the Commissioner and that the Estate Tax Regulation promulgated under Sec. 811(k) of the Internal Revenue Code, 26 U.S.C.A. § 811(k),[1] employs language which explicitly calls for use of the mean value. It is, in fact, the contention of the plaintiff that the use in the Estate Tax Regulation of the term "valuation date" as contrasted to "time of issuance" as used in the Documentary Stamp Tax Regulation, indicates an intent to follow different practices in ascertaining market value under the two statutes. But this reads too much into the minds of the draftsmen. There is little doubt that the Documentary Stock Tax Regulation is an instance of poor draftsmanship and, as the Estate Tax Regulation demonstrates, other phrases more clearly call for use of the mean figure. But I do not feel that here the variation in language is a result of deliberate consideration of this problem and an election to adopt one practice for the estate tax and reject it in the stock tax context.

It cannot be questioned that the phrase "time of issuance" is capable of being construed to mean "date of issuance".[2] In W. T. Grant Co. v. Duggan, D.C.S.D.N. Y.1937, 18 F.Supp. 724, affirmed, 2 Cir., 1938, 94 F.2d 859, one finds the terms used interchangeably. Compare language at 18 F. Supp. 725 ("price at which the stock sold * * * on that day was $56") with that at page 726 ("The Commissioner was cor-

rect in taking the market value of the new shares at time of issue as the measure of the tax.")

While it may be that in this one particular case, with its peculiar factual situation, the language of the Regulation might seem, at first blush, more in accord with taxpayer's contention, the problem of the Commissioner in formulating a policy under which the statute may be made to operate in accordance with the intent of the legislature and yet with a minimum of exceptions and difficult factual inquiries must also be considered. It is noted that his policy and interpretation has worked well and without question for approximately 27 years.

Judgment for the defendant.

---

1. Reg. 105, Sec. 81.10(c) provides that: " * * * the mean between the highest and lowest quoted selling prices on the valuation date shall be considered the fair market value per share or bond * * * ".

2. Cf. Bonner v. Industrial Accident Comm., Cal.App.1943, 140 P.2d 1000;

Hopkins v. Commissioner, 7 Cir., 1934, 69 F.2d 11, 96 A.L.R. 1358, certiorari denied 293 U.S. 560, 55 S.Ct. 72, 79 L. Ed. 661; Augustus v. Com'r, 6 Cir., 1941, 118 F.2d 38, certiorari denied 313 U.S. 585, 61 S.Ct. 1095, 85 L.Ed. 1540; 62 Corpus Juris 960, 1011.